J-S06045-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: L.F.F., M.F.I.F.F. AND J.D.L., MINOR CHILDREN | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.M.L., MOTHER | No. 2756 EDA 2014 |

Appeal from the Decrees entered August 15, 2014,
in the Court of Common Pleas of Northampton County, Orphans'
Court, at No(s): 2014-0009

BEFORE:  BENDER, P.J.E., LAZARUS, and FITZGERALD*, JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED APRIL 17, 2015**

Appellant, S.M.L. ("Mother"), appeals from the decrees[1] entered in the Northampton County Court of Common Pleas involuntarily terminating her parental rights to L.F.F. (born in March of 2012), M.F.I.F.F. (born in November of 2010), and J.D.L. (born in February of 2009)  ("Children").[2]

---

* Former Justice specially assigned to the Superior Court.

[1] We note that on August 15, 2014, the court entered an order which "ORDERED and DECREED" that the Petition for Termination of Parental Rights as to the children was granted.  On August 26, 2014, the court entered three separate final decrees terminating the parental rights of Mother to each child.

[2] On August 15, 2014, the parental rights of T.L.O. ("Father 1"), the father of J.D.L., and L.F.I.F.F. ("Father 2"), father of L.F.F. and M.F.I.F.F., were terminated.  Father 1 and Father 2 are not a party to the current appeal, nor did they file separate appeals.   Father 1 is currently serving a fourteen to thirty-two year sentence in state prison following convictions for substance offenses.   Father 2 is serving a sentence in Northampton County Prison, following a conviction for indecent assault on Mother's oldest child, A.T., from another father.  As a result of Father 2's conviction, Father 2 was found to be a sexually violent predator, and is required to register as a sex offender for life.

Mother contends the trial court erred in finding (1) Children without parental care and control, (2) services available to her were not likely to remedy the conditions which led to placement, and (3) termination of her parental rights was in the best interests of Children. We remand.

We glean the facts from the trial court opinion. In May of 2010, the parties first became known to Northampton County Children and Youth ("CYF") as a result of domestic issues between Mother and Father 2. CYF was concerned with domestic violence, inappropriate people in the family's home, developmental needs of Children, financial stability, and Mother. In October 2010, Father 2 was convicted of reckless endangerment for assaulting Mother while she was pregnant with M.F.I.F.F. Mother was provided services through Lehigh Valley Families Together ("LVFT"). LVFT provided in-home therapy for Mother to address the domestic violence, to assist her with making referrals for Children, and help her become financially stable.

On February 15, 2011, CYF obtained custody of A.T.,[3] J.D.L. and M.F.I.F.F. after Father 2 threw M.F.I.F.F. on a bed at Mother's home when he was three months old. J.D.L. and M.F.I.F.F. have been in continuous care of CYF since their emergency placement on February 15, 2011. On February 24, 2011, the Children were adjudicated dependent, and Mother was ordered to obtain a Protection From Abuse Order ("PFA") against Father 2 and

---

[3] A.T. is Mother's older child.

comply with services. The order also directed Father 2 to have no contact with Children and to complete a batterer's evaluation. Children were to remain in foster care. Mother was ordered to (1) comply with random urine screens; (2) participate in parenting education and life skills training; (3) participate in in-home services; (4) comply with the PFA that she obtained; and (5) obtain stable and legitimate income and housing. N.T., 7/15/14, at 94. Mother was allowed weekly two-hour supervised visits with Children.

On March 30, 2011, Father 2 was incarcerated for terroristic threats, simple assault, and harassment against Mother. On May 31, 2011, Father 2 was released from jail. In July 2011, Mother amended her PFA order against Father 2 to permit contact between them and to have Father 2 reside in her home. In March of 2012, Father 2 and Children had supervised visits in the home.

L.F.F. was born in March of 2012, and remained in the custody of Mother and Father 2. On April 19, 2012, CYF obtained emergency custody of L.F.F. after allegations were made that Father 2 sexually assaulted A.T., and Mother was non-compliant with her parenting classes. The trial court directed Mother to have no contact with Father 2.

Following a hearing, on June 28, 2012, L.F.F. was adjudicated dependent. The trial court found that Father 2 did not comply with domestic violence treatment and Mother did not comply with her parenting treatment. The trial court directed Mother and Father to complete those services and for

Children to remain in foster care. On July 29, 2012, Father 2 was found in Mother's home and arrested for the outstanding warrant for the sexual abuse charges of A.T. On August 1, 2012, Mother was arrested and charged with hindering prosecution and obstructing justice for harboring Father 2.

On October 18, 2012, a permanency review hearing was held. Mother and Father 2 attended the hearing even though they were incarcerated at the time. In November of 2012, Mother was convicted of obstruction of justice and was sentenced to two years of probation. Mother was ordered not to have contact with Father 2.

On October 9, 2013, Father 2 was sentenced to one year to two years' imprisonment for indecent assault of A.T., and was found to be a sexually violent predator.[4] On October 18, 2013, a permanency review hearing was held. Mother attended the hearing, and Father 2 did not attend even though he was released from jail on parole. Following the hearing, the trial court found Mother's progress was minimal, and found aggravated circumstances against Father 2 as a result of the sexual assault conviction. The trial court directed Father 2 to complete sex offender treatment and Father 2 was prohibited from having contact with his children or Mother. On October 28, 2013, a probation violation was filed against Mother for allowing Father 2 to spend several nights at her home.

---

[4] At the hearing, the court took judicial notice that Father 2 had been found to be a sexually violent predator. N.T., 7/15/14, at 182.

- 4 -

On November 8, 2013, the trial court found that Mother violated her probation and she was sentenced to an additional two years of probation. Mother was also directed not to have any contact with Father 2. On November 9, 2013, Father 2 violated his parole by contacting Mother. On November 27, 2013, Father 2 was sentenced to serve the balance of his sentence, and he remains incarcerated.

On November 19, 2013, Mother violated her probation for using third parties to exchange letters and phone calls with Father 2. On November 22, 2013, Mother was sentenced to one to two years in state prison, and Mother remains incarcerated. Mother's last visit with Children was in November of 2013.

On February 20, 2014, CYF filed petitions to involuntarily terminate Mother and Father 1's parental rights to J.D.L., and Mother and Father 2's parental rights to L.F.F. and M.F.I.F.F. In June 2014, Mother attempted to send Father 2 a Father's Day card, which was intercepted by prison authorities.

On July 15, 2014, the trial court held a hearing on the petitions. At the time of the hearing, all parents were incarcerated. At the hearing, Ms. Ryon Solis, Mother's probation officer; Krista Welter, a licensed professional counselor for Forensic Treatment Services; Rebecca Sager,[5] a CYF

---

[5] Ms. Sager worked with the family from July of 2010 through November of 2011. N.T. at 74.

caseworker; Kristy Bernard,[6] a CYF caseworker; Talia Cestone,[7] a CYF caseworker; Donna Reeck,[8] a CYF caseworker; Father 1; and Father 2 testified. On August 26, 2014, the trial court entered its decrees terminating Mother, Father 1, and Father 2's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b), and changing Children's permanency goals to adoption.

Mother filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed a statement "specify[ing] that the place in the record where the reasons of this lower court for the Order terminating the parental rights of [Mother] may be found in the Opinion and Order . . . dated August 15, 2014." Pennsylvania Rule of Appellate Procedure 1925(a) Statement, 9/16/14.

Mother raises the following issues for our review:

1. Did the [t]rial [c]ourt err in finding that the repeated and continued incapacity, neglect or refusal of [M]other have caused [Children] to be without parental care, control and subsistence necessary for their physical and mental well-being and the conditions and cause of this incapacity, neglect or refusal, as well as the conditions which led to

---

[6] Ms. Bernard received the case from Ms. Sager in November of 2011. N.T. at 132.

[7] Ms. Cestone received the case from Ms. Bernard in August of 2012. N.T. at 183.

[8] Ms. Reeck received the case in May of 2013 from Ms. Cestone. N.T. at 232.

placement of [Children], cannot or will not be remedied by [M]other within a reasonable period of time?

2. Did the [t]rial [c]ourt err in finding that the services or assistance made available to [M]other are not likely to remedy the conditions which led to the placement of [Children] in the foreseeable future?

3. Did the [t]rial [c]ourt err in finding that the termination of parental rights and changing the goal to adoption would best serve the needs of [Children]?

Mother's Brief at 3.

Our review is governed by the following principles.

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict.

***In re B.L.W.***, 843 A.2d 380, 383 (Pa. Super. 2004) (*en banc*) (citations omitted).

This Court has stated

> [i]n a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. Our appellate review, however, does not require us to find clear and convincing evidence. We will affirm if the trial court's findings are supported by competent evidence, even if the record could also support an opposite result.
>
> In addition, we need only find competent evidence to support the trial court's decision as to any one subsection of 23 Pa.C.S. § 2511(a) to affirm the termination.

- 7 -

*In re S.H.*, 879 A.2d 802, 806 (Pa. Super. 2005).

In terminating Mother's parental rights, the trial court relied upon Section 2511(a)(1) and (b) which provide:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> > \*    \*    \*
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

We have explained this Court's review of a challenge to the sufficiency of the evidence to support the involuntary termination of parental rights pursuant to section 2511(a)(1) as follows:

> To satisfy the requirements of section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a

settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,

Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to [s]ection 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to [s]ection 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citations omitted).

The Supreme Court has defined parental duty as follows:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

- 9 -

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted).

Instantly, the trial court found that J.D.L. and M.F.I.F.F. have been in continuous care of CYF since 2011, and L.F.F. has been in continuous care of CYF since 2012. Trial Ct. Op., 8/15/14, at 12. The trial court opined:

> [Mother] has repeatedly placed [C]hildren in danger at the hands of Father 2 and has failed to avail herself of the myriad of services offered to her by [CYF]. Instead, she continued to surreptitiously pursue her relationship with Father 2, going as far as to use third parties to facilitate phone calls and send letters to Father 2. Mother continued to deny Father 2's abuse of her eldest son, A.T., and in fact harbored Father 2 while there was a warrant for his arrest on the sexual assault charges. Mother has refused to establish a safe home, away from Father 2, for [C]hildren. Mother remains incarcerated for her willful violations of [c]ourt orders directing her to stay away from Father 2. As recently as a month before trial, Mother continued to correspond with Father 2. Like Father 2, Mother has not and cannot perform her parental duties.

*Id.* at 11.

Ms. Welter testified Mother was referred to her agency by CYF for protective parenting. N.T., 7/15/14, at 36-37. Protective parenting is

treatment provided to individuals in relationships with perpetrators or family members who have abused someone. *Id.* at 37. Mother reported a lengthy history of domestic violence perpetrated on her directly by Father 2. *Id.* at 41. When an individual denies, excuses or minimizes behaviors like those perpetrated by Father 2, it is difficult to protectively parent a child. *Id.* at 42. Mother continued to display disbelief regarding Father 2. *Id.* at 43. She did not believe Father 2 sexually abused her son. *Id.* at 43-44. Mother was an unsafe parent. *Id.* at 47. Mother presented as having a job although she had lost it. *Id.* at 52.

Ms. Sager testified. She made a referral to LVFT for in-home therapy. *Id.* at 80. Mother did not get "very far with either acknowledging or processing the domestic violence in the relationship." *Id.* at 113. She "did not believe that any of the issues that lead to the initial dependency had been resolved or thoroughly addressed in order to feel safe having Children returned]." *Id.* at 116-17. Mother "was ordered to comply with random urine screens, parenting education and life skills training, in-home services, non-offending parenting, counseling[,] the PFA that she had obtained, and to obtain stable and legitimate income and housing." *Id.* at 94.

Ms. Bernard received the case from Ms. Sager in November of 2011. *Id.* at 132. Dr. Gill[9] recommended that Father 2 have no unsupervised contact with any minor children. *Id.* at 147. Ms. Bernard testified that

---

[9] We note the parties stipulated to Dr. Gill's report. N.T. at 14. Our review of the record does not reveal Dr. Gill's first name.

Mother never accepted the possibility that Father 2 could harm Children after Father 2's allegations of sexual abuse. *Id.* at 159.

Ms. Cestone testified she received the matter through Ms. Bernard. *Id.* at 183. Mother, upon her release from prison, "would have to cooperate with random urine screens, mental health treatment, parenting instruction, and maintain stable housing, employment, and cooperate with non-offending parenting." *Id.* at 188. Mother told Ms. Cestone that "she did not find [Father 2] to be a dangerous individual to anyone." *Id.* at 199. When she was ready to transfer the case, Ms. Cestone did not think Mother was in a position to parent Children. *Id.* at 207.

Ms. Reeck testified that Mother was aware that Father 2 was designated a sexually violent predator. *Id.* at 238. Ms. Sager, Ms. Bernard, and Ms. Reeck testified that Mother did not complete her LVFT services, parenting classes, mental health treatment, and domestic violence therapy due to her lack of attendance and her refusal to discuss her relationship with Father 2. *Id.* at 99-101, 111, 165, 173, 238-39.

We defer to a trial court's determination of credibility, absent an abuse of discretion, and discern no such abuse in its finding credible the testimony of the CYF caseworkers and Ms. Welter. *See In re S.H.*, 879 A.2d at 806. Moreover, the record makes apparent that Mother has failed or refused to perform parental duties. *See* 23 Pa.C.S. § 2511(a)(1); *In re Z.S.W.*, 946 A.2d at 730; *In re B., N.M.*, 856 A.2d at 855. Accordingly, we can discern

no abuse of discretion or error of law in the trial court's conclusion. ***See In re B.L.W.***, 843 A.2d at 383.

Mother argues that the trial court erred in finding that the termination of parental rights would best serve the needs and welfare of Children. Mother avers that a bond exists between Mother and Children, and thus termination of her parental rights would be "contrary to the intent and purpose of Pennsylvania statutes and appellate case law." Mother's Brief at 13.

With regard to Section 2511(b), this Court has stated:

> Once the statutory requirement for involuntary termination of parental rights has been established under subsection (a), the court must consider whether the child's needs and welfare will be met by termination pursuant to subsection (b). In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.

***In re Z.P.***, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted).

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. The mere existence of an emotional bond does not preclude the termination of parental rights. ***See In re T.D.***, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). As we explained in ***In re A.S.***, 11 A.3d 473, 483 (Pa. Super. 2010),
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the

> child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

We note from our review that the trial court recognized Section 2511(b). However, the trial court did not complete an analysis of the nature of the parent-child bond and the effect on Children of permanently severing that bond. Without the trial court's Section 2511(b) analysis of the bond between Mother and Children, and effect on Children from severing such a bond, we are constrained to remand this matter to the trial court for an opinion addressing the bond between Mother and Children, and the effect a termination of parental rights would have on Children. On remand, the trial court shall conduct an analysis regarding this issue.

Additionally, the trial court shall provide an analysis of its reason for changing the permanency goal to adoption pursuant to 42 Pa.C.S. § 6351. This Court has stated:

> When we review a trial court's order to change the placement goal for a dependent child to adoption, our standard is abuse of discretion. . . . We are bound by the trial court's findings of fact that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's

- 14 -

findings are supported by competent evidence of record, we will affirm even if the record could also support an opposite result.

Next, we note that in matters of placement for a dependent child, the trial court must be guided by the best interests of the child—not those of his or her parents.

Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act [, which] place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over all other considerations, including the rights of the parents.

At each review hearing for a dependent child who has been removed from the parental home, the court must consider the following, statutorily-mandated factors:

the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved. [42 Pa.C.S. § 6351(f)].

\* \* \*

When the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home. This Court has held that the placement process should be completed within 18 months.

*In re A.K.*, 936 A.2d 528, 532-33 (Pa. Super. 2007) (some citations omitted). We direct the trial court to address the change of goal to adoption.

- 15 -

Accordingly, we remand this case, and direct the trial court to file an opinion pursuant to Pa.R.A.P. 1925(a), within fourteen days of the date of this memorandum.

Case remanded with instructions. Jurisdiction retained. Prothonotary instructed to issue new briefing schedule upon receipt of Rule 1925(a) opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/17/2015